UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORNELIUS M. MCCLENDON,

      Petitioner,

    v.

CHARLES W. CALLAHAN, Warden,[1]

      Respondent.

Case No. 17-cv-03271-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Petitioner Cornelius M. McClendon challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, Dkt. No. 13, and Petitioner has filed a traverse, Dkt. No. 17. For the reasons set forth below, the petition is denied.

**I.**    **PROCEDURAL HISTORY**

    **A.**    **Conviction and Sentencing**

On August 7, 2012, the Contra Costa County District Attorney filed an information charging Petitioner with two counts of forcible rape, forcible oral copulation, attempted murder, inflicting corporal injury to a cohabitant, and unlawfully attempting to dissuade a witness from testifying. *People v. McClendon*, No. A138039, 2015 WL 5257759, *1 (Cal. Ct. App. Sept. 9, 2015). It was alleged that in the commission of the sexual offenses Petitioner engaged in tying and binding the victim and personally inflicted great bodily injury. *Id*. It was further alleged that Petitioner personally inflicted great bodily injury in the commission of attempted murder and inflicting corporal injury to a cohabitant, and that he had suffered a prior conviction for a serious

---

[1] Charles W. Callahan, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

felony. *Id.*

At trial, Petitioner appeared in propria persona. *Id.*

On November 27, 2012, the jury found Petitioner guilty of the two counts of forcible rape, the count of forcible oral copulation, and the count of inflicting corporal injury to a cohabitant. *Id.* The jury found true the tying and binding allegations, but not the inflicting of great bodily injury allegations. *Id.* Petitioner was found not guilty of attempted murder and dissuading a witness from testifying. *Id.* Petitioner waived jury trial on the prior conviction charge, and the trial court subsequently found the allegation true on January 4, 2013. *Id.* On February 1, 2013, Petitioner was sentenced to thirty-five years to life in state prison. *Id.*

**B.      Post-Conviction Appeals and Collateral Attacks**

On February 5, 2013, Petitioner filed a timely review in the California Court of Appeal. *Id.* On September 9, 2015, in an unpublished opinion, the California Court of Appeal affirmed the trial court's judgment but granted Petitioner an additional day of custody credit. *Id.* at *17.

On October 14, 2015, Petitioner filed a petition for review in the California Supreme Court, seeking review of the state appellate court's denial of his appeal. Answer, Exs. G. On November 18, 2015, the California Supreme Court summarily denied review of the state appellate court decision. Answer, Ex. H.

On November 23, 2015, the California Court of Appeal issued the remittitur, which indicated that "[c]osts [were] not awarded at this proceeding." Answer, Ex. I.

On December 19, 2016, Petitioner filed a motion in the California Court of Appeal to recall the remittitur. Answer, Ex. J. On January 27, 2017, Respondent filed an opposition to Petitioner's motion. Answer, Ex. K. On February 1, 2017, the California Court of Appeal summarily denied Petitioner's motion. Answer, Ex. L.

On March 6, 2017, Petitioner filed a petition for review in the California Supreme Court, seeking review of the state appellate court's denial of the recall motion. Answer, Ex. M. On April 12, 2017, the petition for review was summarily denied. Answer, Ex. N.

## C.    Federal Court Proceedings

On June 7, 2017, Petitioner filed the instant federal habeas petition. Dkt. No. 1. Petitioner raised the following six claims for habeas relief: (1) he was coerced into a *Faretta*[2] waiver of trial counsel; (2) his appellate counsel was ineffective in failing to raise the waiver of trial counsel claim; (3) the trial court erred in excluding evidence from the victim's medical records; (4) the trial court erred by admitting evidence of alleged past acts of uncharged domestic violence; (5) the trial court erred in using jury instruction CALCRIM No. 852 on the use of propensity evidence; and (6) the cumulative effect of these claimed errors violated his due process rights. *Id.* at 5-6.[3]

On August 1, 2017, Magistrate Judge Donna M. Ryu issued an Order to Show Cause. Dkt. No. 5. Thereafter, the case was reassigned to the undersigned. Dkt. No. 8. An answer was filed on January 12, 2018. Dkt. No. 13. A traverse was filed on March 26, 2018. Dkt. No. 17.

## II.    STATEMENT OF FACTS

The following factual background is taken from the September 9, 2015 opinion of the California Court of Appeal:[4]

> Jane Doe testified that she and appellant started dating in March 2010, and began living together in September 2010. In April 2011, Doe and appellant were arguing about appellant's drinking, Doe sitting at the kitchen table. Appellant pushed Doe's head, causing her to fall to the floor and hit her head, leaving a "knot" on her forehead. She got up and went to the bedroom to get her shoes; he followed, pleading with her not to leave, she argued with him, and he threw her on the bed, got on top of her and restrained her as she "mouth[ed] off at him." She screamed and at some point banged on the wall, hoping the neighbors would hear. Appellant eventually got off of her, or she got out from under him, and she left the apartment with him following her and pleading, "what are you doing? This is crazy." She screamed for the neighbors to call the police. Once she got to her car, appellant blocked her from closing the door. Eventually some neighbors came out and got appellant away from the door, and Doe drove around the corner and called the police.[FN

---

[2] *Faretta v. California*, 422 U.S. 806, 832 (1975).

[3] Page number citations for the parties' filings refer to those assigned by the Court's electronic filing system and are located at the top right-hand corner of each page.

[4] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

1]

> [FN 1]: Appellant states that while Doe testified she was not intoxicated, she admitted on cross-examination that she "was bar hopping and was intoxicated as well." At the page of the reporter's transcript cited, appellant asked Doe, "Regarding your report on April 18th, 2011, it says in your report—you say that on St. Patrick's Day 2011 that we went out to Walnut Creek, and I got very intoxicated; is that correct?" Doe answered "yes," and appellant continued, "Why did you forget to mention that you got off work early and assisted [*sic*] on going to bar hop, and you were very intoxicated as well?" Doe replied, "I don't know why I failed to mention that." In 2011, St. Patrick's Day fell on March 17; the domestic dispute at issue occurred on April 18.

Police Officer Tamra Roberts testified that on April 18, 2011, she responded to the report of a domestic dispute and spoke with appellant, who initially gave his name as Cornelius Matthew. He appeared to be under the influence of alcohol and, once at the jail, was found to have a blood alcohol concentration of 0.165. Doe did not appear to be under the influence of alcohol. She had a "goose-egg-size" lump on the right side of her forehead, her lower lip was swollen, she had a cut or abrasion on the inside of her lip and there was a red mark on her arm consistent with the size of a finger. She stated that she did not desire prosecution.

Doe testified that on May 25, 2011, while she and appellant were arguing, he grabbed her and threw her against the kitchen wall, pinning her by her arms. Doe's six-year-old son, who had been playing, got scared and ran to hide in his room. She struggled to get away from appellant and screamed to her son to get out of the house, get the neighbors, and get the police, but he was too scared. Doe got free, grabbed her son and went out the front door as appellant tried to pull her and prevent her from leaving. A neighbor let her and her son in and called the police. The police took Doe's statement and when they checked her house, appellant was gone.

Police Officer Scott Johnson testified that Doe was crying when he contacted her at her apartment. He saw a cup of spilled orange juice on the coffee table and, in the kitchen, a picture that had been knocked off the wall and was on the floor in the area where Doe said appellant had slammed her against the wall. Doe did not want prosecution.

On July 10, 2011, Doe and appellant were arguing as they walked to Safeway through a park behind their apartment. She turned around to walk back home and he followed, still arguing. Doe testified that she was "pretty sure" she was aggravating him; she "might have been screaming at him, calling him a loser, saying leave me alone." He grabbed her and pushed her down on the gravel at the side of the path and she put her hands out to break her fall, hitting her wrist and scraping her shoulder. He walked away. She got up and was trying to run away when he caught up with her and, as he approached, she swung her hands at him. He laughed and asked what she was doing and she said she was "sick of it" and "going to fight back." She lay on the ground so appellant could not push her down and screamed for help. A neighbor called the police and came to help her, by which time appellant was gone. Doe spoke with the police and returned to her apartment when they said it was safe to do so. The next day, Doe went to Kaiser and was found to have a fractured elbow. Doe acknowledged on cross-examination that she bit appellant in his face during the argument.

Police Sergeant Richard McEachin and Officer Richard Enea responded to a report of a woman screaming in Westwood Park and were approached by a man who said the woman

4

was in his apartment. As they followed the man, McEachin saw appellant in the apartment parking lot, looking "a little agitated." At the apartment, McEachin took a statement from Doe. She had abrasions on her left shoulder and arm and a swollen left wrist, and it appeared she had been drinking alcohol. She did not want prosecution. Both officers testified that appellant appeared to be intoxicated, and had a scratch on his face. Enea arrested appellant, who was very upset, saying he needed to get to work the next day, and thrashing around and yelling when he was put into a patrol car. At the jail, appellant was found to have a blood alcohol level of 0.142.

Doe testified that in April 2012, she went to pick appellant up from a job and found him "completely intoxicated." He had a bottle of Hennessy that he said one of the guys had given him for his birthday. Doe yelled at him, upset that he had been drinking at work, and because they had promised not to drink. As she was driving, she grabbed the bottle and threw it out the window. Appellant pushed her head toward the window, which was open. She swerved, then pulled over hard, took the keys from the ignition and got out of the car. He was swearing and calling her names; she "may have been" cussing back at him. She walked away, calling 911, then hung up because a California Highway Patrol officer, who happened to be driving past, stopped and asked if she needed help. She said appellant was drunk and they had a fight, but he was walking it off and she would drive home. Appellant did not have keys to the apartment at that time because she had not returned them after he threw them at her during a previous fight, so she knew he could not get into the apartment. Doe testified that she did not want to be hurt anymore but did not want to see appellant in trouble. As she was driving home, appellant called, continuing to scream at her, and she told him to leave her alone, "it's over." She told him not to come to the house and said she would call the police if he came there drunk. She also had his cell phone shut off, which was on a plan she paid for.

Forty-five minutes to an hour later, appellant was back in the house, still "pretty drunk," and the argument resumed. She was asking him to leave and as she stood at the open front door, he "charged" toward her, grabbed her and threw her against the door, causing the doorknob to make a hole in the wall behind. She ran out of the house, got into her car and called the police. Seeing appellant leaving the apartment with her belongings, including her work laptop, she got out of the car and struggled with him over the laptop; he eventually let go and she returned with it to her car. The police arrived and arrested appellant, who had gone back into the apartment. This time, when the police asked if she wanted a restraining order and a "kick-out" order, she said yes.

Police Officer Tony Killion spoke with Doe outside the residence, then went inside and saw a hole in the wall behind the front door at doorknob height, consistent with Doe's statement. Doe indicated she did not want prosecution.

Prior to returning to the house that day, appellant left two voicemail messages for Doe, recordings of which were played for the jury. The first said, "You're going to stay in this relationship no matter what because I will beat your ass." In the second message, appellant threatened to break into Doe's house.

In Doe's mind, the April 2012 incident was the break-up of her relationship with appellant. Afterward, they still saw each other, were friends, and slept together, but they were not together as a couple and he did not move back into the apartment. Appellant tried to get back together, constantly saying he loved her and would do whatever he had to for them to be together, alternating with being angry.

On June 3, 2012, as far as Doe knew, appellant still did not have a key to the apartment.

Doe went to sleep after midnight, alone in the apartment aside from her dog. The power had gone out shortly before she went to sleep. About 3:00 a.m., she woke up and found appellant standing in her bedroom doorway talking to her. Shocked, she asked how he got in and what he was doing there. He said he came to check on her because he was driving by and saw the power was out. She could tell he was drunk and told him to sleep on the couch. He left, then came back and tried to get into bed with her but she insisted he leave and he went to the couch, where she found him sleeping when she got up at 6:00 a.m. She tried to wake him up, telling him he had to leave. He said he would but began searching for something he could not leave without; she could not remember what it was. He wanted to talk about when they could get back together and she refused to have the discussion, saying she was dating other people. He had discovered a couple of weeks before that she was dating online and at some point said the real reason he was at the apartment was because he had heard she was "fucking some Dutch biker from Match." It turned out Doe had told her cousin about meeting this person and the cousin's ex-boyfriend had told appellant. She told appellant to leave and he started to cry, then when she did not act sympathetic, he got angry.

Appellant grabbed Doe and pushed her across the living room until she fell back and hit the floor, with him on top of her, strangling her with both hands on her neck. At first, Doe thought it was not that serious, as appellant had choked her before, but she then realized his grip was getting tighter and he was not letting go. She was losing her ability to breathe. Doe told appellant she loved him and they could be together, that he was not a murderer, "anything I could think of to let him you know—realize what he's doing so he would stop." The pressure appellant was applying increased to the point where she could not speak and was losing strength. Doe felt her body shutting down and realized she was going to die. She managed to turn onto her stomach and get two gasps of air, but appellant turned her back over and continued strangling her. She felt herself urinate, could not see, felt her teeth biting down on her tongue, and lost consciousness.

Doe regained consciousness, her vision gradually returning, and saw appellant kissing her forehead "like you would be kissing a dead body." He was ranting to himself, "oh, my God, what have ever I done, I'm going to jail." She played dead. She heard him go into the kitchen, heard the sound of a knife coming out of the knife block, thought he was going to "butcher me to pieces," and wondered if she could get to the door because she felt paralyzed. Then she heard what sounded like appellant trying to stab himself. Appellant returned and touched Doe's face as though trying to see if she was alive. He realized she was not dead and told her to "quit playing," got a power cord and tied her wrists in front of her body, got a red tank top and gagged her with it, carried her to the bedroom and put her on the bed.

Appellant started ranting, angry, then "sort of sad," then angry again. He removed Doe's pants and underwear, pushed her top up so her breasts were exposed, and removed his clothes. He engaged in oral sex with her for a minute or two, spit on his penis and had vaginal intercourse with her for about 10 minutes, then stopped and continued yelling at Doe. Appellant went to the kitchen, saw beers in the refrigerator and took this to mean she was having other men over, and started drinking them. Telling Doe she had taken everything away from him and was not going to get away with it, appellant started taking pictures of her, still naked, tied and gagged, with his cell phone camera, saying he was going to email them to her work and destroy her reputation. He then had vaginal intercourse with her for another 10 minutes or so. When he stopped, he continued talking and yelling, going through "cycles of sort of anger and sadness."

Doe was crying, signaling to appellant to take the gag off and let her talk, and at points

6

gasping for air because her neck was in severe pain from the strangling and she was having moments of not being able to breathe well. Eventually, he let her pull the gag down and untied her hands. Trying to "win him over" and gain his sympathy and trust, Doe told him no one had to know, it was her fault, she should not have broken up with him. At her urging, he lay down with her. She told him she needed to go to the hospital and at first he resisted, then eventually agreed but said he was going with her. Wanting to convince him not to do so, she told him she would have to say she had been strangled and did not want him to get into trouble, but he insisted. Doe thought if she could get somewhere public, she might be able to signal to someone that she was with appellant against her will, so she told appellant they needed to return a "Rug Doctor" she had rented from Safeway. Once there, she was not able to communicate her distress to anyone because appellant was right next to her; also, she was confused, knowing she needed to get away from appellant but not sure she wanted to get him in trouble.

Appellant agreed to let Doe go to the hospital without him but demanded that Doe drive him to Pittsburgh[5], where he was staying at his mother's house. He continued to alternate between anger, sadness and sympathy, but was angry at the point they arrived at the liquor store where he wanted to be dropped off. He grabbed her wrist and squeezed it in anger, still yelling at her. When he slammed the car door and stormed into the liquor store, she drove away.

Doe drove around, unsure whether to go to the police or the hospital, called her cousin, then went to Kaiser Hospital in Walnut Creek. The police were called and came to the hospital. Doe was then transferred to the county hospital in Martinez, where a SART (Sexual Assault Response Team) exam was performed. Doe testified that when she went to the hospital, a huge bruise the size of a baseball was forming on one of her arms, she had marks on her neck, her neck was sore, and it was hard to breathe.

Doe acknowledged on cross-examination that on May 11, irritated at appellant persisting in trying to have sex with her when she was no longer in the mood, she told him, "the only way you're going to have sex with me is if you rape me." He stopped as soon as she used the word "rape." Doe had used this word once before, early in her relationship with appellant, when they were very drunk, had sex, and Doe "said it in a joking manner just because I was close to a black-out state like oh, you raped me...."

Police Officer Beth Long spoke with Doe in the emergency room at Kaiser. Doe had red marks about half an inch to an inch long on the left side of her neck, a bruise about the size of a baseball on her right bicep, a bruise on top of her right hand near the pinky and bite marks on her tongue. She was sad and crying, but was able to relate what had happened. Doe's injuries were documented in photographs taken at the hospital on June 3 and at the police station the next day.

Ana Maree Rea performed the SART examination at the Contra Costa Regional Medical Center (CCRMC) on June 3 and testified that her physical findings were consistent with the history Doe provided. Doe related the events, including that while being choked, she felt her arms and legs getting weaker, her neck and throat were hurting, it was hard to breathe, and she was unable to stop biting her tongue, and she urinated on herself. Rae testified that biting on the tongue and loss of bladder control are consistent with someone being choked. During the examination, Rae noticed petechiae—"little red dots"—on Doe's face

---

[5] The Court assumes that this is a typographical error in the Court of Appeals' opinion, and that the Court of Appeals meant "Pittsburg."

from the top of her hairline, around her jawline, and across her upper cheek area, the result of small capillaries bursting due to pressure. In a case involving strangulation, the presence of petechiae indicate "a lot of pressure" was involved. Doe also had petechiae on her inner eyelids, which is usually the first place they appear. Rae acknowledged that petechiae can result from causes other than strangulation, such as severe vomiting or coughing attacks that prevent getting enough oxygen and cause pressure. They could "probably" result from someone "crying hysterically."

Doe had an "opened injured area" on the right side of her tongue, bruising on the left side where her teeth would have been biting on it, and a bruise and abrasion on the inside of her lower lip. There was a bruise about two and a half by three and a half inches in diameter on her right upper arm. She had two reddened abraded areas on her neck, an injury not unusual in someone with a history of strangulation, resulting from the assailant's fingers or the victim trying to claw the hands off the neck. She had bruises on her right hand near the little finger and at the wrist.

Doe was given ice chips to try to swallow because her throat hurt so badly; she did not want to drink water or ice chips because they had tried to have her swallow pudding at Kaiser and she knew it was going to hurt, and she grimaced when she tried to swallow. Her voice was raspy and, when asked, Doe said this was not her normal voice. A raspy voice and difficulty swallowing are consistent with being strangled. A CT scan of Doe's neck did not reveal anything abnormal, which was not inconsistent with a history of strangulation. Rae testified that it is possible for a person to have no damage to their trachea but have trouble swallowing after strangulation.

An external vaginal examination revealed a breakage of skin indicating recent trauma or penetration. No internal vaginal injury was found, which Rae testified did not indicate an absence of forced entry. Rae explained that "[n]ot everybody" sustains a vaginal injury during sex because the vagina is "made to adapt."

On the afternoon of June 3, at Doe's apartment, the police found a knife on the kitchen counter and, in the bedroom, a red and white shirt on the bed, an electrical cord on the floor, and a beer bottle in the trash can.

On June 4, Doe participated in a pretext phone call with appellant at the request of Detective Kevin Choe, a recording of which was played for the jury. Doe confronted appellant about his choking, tying, gagging, and raping her, and he did not deny any of these actions; he talked about his love for her and distress over not being with her and her being with other men, and said he was sorry and was not trying to kill her. When Doe asked why he choked her "until [she] was dead," appellant said he did not know. He said, "when I heard that you was messing with people and sleeping with people and shit like, I couldn't take it and I turned over the rocks and it hurt. And I—it—it drove me crazy, man.... [U]ntil you go through it yourself, like when you hear about it, like crimes of— crimes of passion and shit, like I—I w—I—I lived it. I—I never understood it until now, you know what I mean, I been—I done been a part of that shit." Appellant claimed he got a towel and washed her face, saying "you didn't come to on your own, man," said he gave Doe CPR and expressed surprise that she did not remember this. Appellant denied thinking that Doe was actually dead but acknowledged knowing it "went too far" and "wasn't cool." When she asked why he forced sex on her when she was tied up and gagged, he responded, "how do I answer that" and "what am I supposed to say to that?"

Appellant was interviewed by the police on June 7.[FN2] He initially denied hurting Doe or having any physical contact with her on the morning of June 3. After being confronted with

8

the recording of the pretext phone call, appellant eventually stopped these denials and said he "kinda—blacked out" and did not remember all of what happened, "it's a blur." He said he and Doe had a heated argument about her cheating, then admitted choking Doe but said he was not going to kill her, just "lost it for a minute." Appellant said he "blacked out" and did not remember whether he used both hands around her neck, had sex with her, or tied her wrists together, then said he had sex with Doe once and acknowledged tying her wrists because he wanted her to listen to him.

> [FN 2]: A recording of part of the interview was played for the jury; the recording of the balance of the interview was admitted into evidence and made available to the jury.

Doe received several letters from appellant while he was in custody. In one from the summer of 2013, appellant described being scared, said he was working with his lawyer and said, "But it looks bad. Only real way would be if you withdrew or decided not to testify. Other than that, it's going to be fireworks soon. I can say my lawyer is going for the kill. He [is] throwing out names that I don't even know."

### Defense

Appellant testified that he and Doe had a lot of arguments. He stated that he worked 10– and 12–hour days, then cooked dinner, while she got off work at 4:00 p.m. but would come home at 6:00 or 8:00 p.m. with no explanation. He stressed that he had never punched or hit a woman, and that he was not prosecuted for any of the alleged prior domestic violence incidents—in his view, because Doe knew the fights were "equal or more or less her fault," as he never started a fight.

With respect to the incident on July 10, the day he and Doe were walking to Safeway, appellant said Doe started "attacking him" about the amount of money he was making and calling him "half a man" and "a piece of shit." He "grabbed her like I always do to restrain her while she's yelling in the park," and she bit his cheek. He pushed her off, tried to grab her immediately but missed, and she fell. He protected her by telling the police the bite mark on his face was a scratch.

Appellant testified that after April 7, 2012, "it just got worse and worse, and I tried everything that I could to make this work. And it was no sign that the relationship wouldn't work out." On April 13, the day the emergency protective order was lifted, he came to Doe's apartment and spent the night. Although he was "technically" living at his mother's house, he spent many nights a week at Doe's, continued to cook, clean and tutor Doe's son, and "[e]verything was normal except I came over with a backpack." But Doe would kick him out whenever she wanted to and he felt she was trying "to see exactly what I would put up with." She told him she would be dating other people but not to worry about it, if he went back to school "and all these sort of things," everything would be fine.

On June 3, appellant testified, he went to check on Doe because of the power going out in the area. She told him to sleep on the couch and he did; he never went back into her bedroom. In the morning, Doe told him to leave and they looked for his phone, which they eventually found in the bedroom. Appellant testified, "sex was initiated, was started barely," then the power came on and he stopped. He went into the kitchen and instantly knew Doe had entertained someone because he saw wine and beer of a type neither he nor Doe drank, as well as burgers on the stove. He took a beer back to the bedroom and said, "oh, you had company," she said no, and a heated argument ensued. He called her "everything under the sun," saying "verbal things out of hurt and pain" that were "pretty harsh." Appellant denied raping or attempting to murder Doe. He said he picked Doe's

panties up from the floor and, finding them damp, said, "you pissed yourself you were so drunk last night," and this started another argument. Doe told him to get the Rug Doctor to return to Safeway, he put it in the car and they drove to Safeway in silence. Appellant walked into the store with Doe, then left to smoke. According to appellant, Doe's story about wanting to get help at Safeway was fabricated: If she had wanted to get away from him, she could have run or cried for help when he went outside.

As Doe drove him to Pittsburg, appellant was angry and hurt, believing he had been doing everything he was supposed to do to "get her back all the way." He was again "laying into her" and Doe was crying. As he was about to get out of the car at the market, she suddenly started "bouncing her knee" and "clacking her teeth," saying her throat hurt and she was going to the hospital. He asked if she wanted him to go with her and told him to "[j]ust get out." He slammed the door, then opened it and said he hated her. Appellant testified, "I knew she was up to something, but I didn't know what." Half an hour later, Doe's cousin's ex-boyfriend called appellant and told him Doe said he had broken into her house and raped her. Appellant texted Doe but got no response. The next day, he got a text saying "I'm okay." He took this to mean she had calmed down.

Discussing the recorded phone call, appellant testified, "When I called her, I knew I shouldn't of had that conversation, but I wanted to find out what—exactly what was she saying." He said that in the phone conversation he tried to "steer away from her pulling me into things that I shouldn't and weren't true while I tried to figure out what was going on, but I stepped in a couple of bear traps trying to progress." Appellant testified that "as hard as she tried to, I never said anything about raping her or trying to kill her. I tried to steer away from it, but I still said a little too much." The conversation was "fishy" and it was obvious "something was going on." When appellant went to talk to the police on June 7, he told them "exactly what was going on," but as soon as the officer said he had a recorded conversation, appellant knew he was in deep trouble.

Appellant testified on cross-examination that he felt pressured by the police during his interview. When he realized he had been caught in the phone call, he told the police he did not remember what happened because he was trying not to incriminate himself; he was lying when he said he blacked out. He denied ever tying Doe up, although he told the police he did. Appellant testified that in the phone conversation he went along with some of Doe's accusations in an attempt to get information from her, but he acknowledged that he never offered this explanation to the police. Appellant also denied having ever pushed, kicked, or choked a woman. He acknowledged that on April 7, 2012, he "elbowed" Doe when they were going out the door at the same time, causing her to bump into the door and the doorknob to make a hole in the wall. He denied knocking Doe off the bar stool on April 18, 2011; he elbowed her after she lunged at him, and he did not cause her to hit her head. On July 10, he pushed Doe to the ground after she bit his face, but he did not intentionally injure her.

*McClendon*, 2015 WL 5257759, *1-8 (footnotes in original and brackets added).

## III.    DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus

"in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal

11

habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the "last reasoned decision" by the state court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

In its unpublished disposition issued on September 9, 2015, the state appellate court addressed the merits of the claims relating to the trial court's errors in excluding the victim's medical records, allowing evidence of uncharged domestic violence, and instructing the jury on the use of propensity evidence. *McClendon*, 2015 WL 5257759, *8-16. Therefore, the last reasoned decision as to these claims is the California Court of Appeal's unpublished disposition. *See Wilson*, 138 S. Ct. at 1192; *Cannedy*, 706 F.3d at 1156.

The state appellate court also noted that Petitioner additionally argued that the cumulative effect of all of the enumerated errors required reversal, but concluded that there was "no need for [the court] to address the cumulative error argument" after rejecting the individual claims of error. *McClendon*, 2015 WL 5257759, *16 n.14. However, Petitioner raised his cumulative error claim in his petition for review. *See* Answer, Ex. G; Dkt. No. 13-13 at 226-27. As mentioned, the state supreme court summarily denied the petition, and thus no reasoned decision exists on his cumulative error claim. *See* Answer, Ex, H.

Meanwhile, Petitioner first raised his waiver of counsel and ineffective assistance of appellate counsel claims in his motion to recall the remittitur in the California Court of Appeal and in his petition for review from the order denying his motion to recall the remittitur in the California Supreme Court. *See* Answer, Exs. J, M; Dkt. No. 13-14 at 15-18, 67-70. No reasoned

decision exists on these claims because they were summarily denied by the state courts. *See* Answer, Exs. L, N.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay,* 692 F.3d 948, 957 & n.3 (9th Cir. 2012). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The Supreme Court has repeatedly affirmed that under AEDPA, a federal habeas court must give a heightened level of deference to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington*, 562 U.S. at 97-100; *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam). As the Court has explained, "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted). With these principles in mind, the Court addresses Petitioner's claims.

**B.      Petitioner's Claims**

Petitioner raises the following six claims: (1) he was coerced into a *Faretta* waiver of trial counsel; (2) his appellate counsel was ineffective in failing to raise the waiver of trial counsel

claim; (3) the trial court erred in excluding evidence from the victim's medical records; (4) the trial court erred by admitting evidence of alleged past acts of uncharged domestic violence; (5) the trial court erred in using jury instruction CALCRIM No. 852 on the use of propensity evidence; and (6) cumulative error. *See* Dkt. No. 1 at 5-6.

### 1. Waiver of Counsel (Claim 1)

Petitioner, who represented himself at trial, alleges that because the trial court ordered him to file a *Faretta* waiver, he was coerced into waiving counsel, thereby violating his Sixth and Fourteenth Amendment Rights. *Id.* at 5, 20-22. As mentioned above, because this claim was summarily denied by the state courts, there is no reasoned opinion that addresses this claim. So this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Richter*, 562 U.S. at 102. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent. *Id.* As discussed below, the Court finds that Petitioner's claim does not merit federal habeas relief.

### a. Applicable Federal Law

A criminal defendant has a Sixth Amendment right to self-representation. *Faretta*, 422 U.S. at 832. A defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay. *Id.* at 835; *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994); *Adams v. Carroll*, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989). Before a trial court may allow self-representation, it must conclude that the defendant has "knowingly and intelligently" waived his underlying right to counsel. *Faretta*, 422 U.S. at 835. Consequently, the Sixth Amendment requires that a state trial court, before letting an accused proceed *pro se*, ensure that he is "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is

made with eyes open.'" *Snook v. Wood*, 89 F.3d 605, 613 (9th Cir. 1996) (quoting *Faretta*, 422 U.S. at 835). The best practice is for the trial court to have "a discussion with the defendant, in open court and on the record, of the critical elements and risks of self-representation." *McCormick v. Adams*, 621 F.3d 970, 977 (9th Cir. 2010).

The Supreme Court has "not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Thus, "[n]o clearly established Supreme Court case law requires trial courts to apprise defendants in any particular form of the risks of proceeding to trial *pro se*." *Arrendondo v. Neven*, 763 F.3d 1122, 1130 (9th Cir. 2014). The Ninth Circuit has held that a "meticulous litany" is not required; a defendant must only be made aware of (1) the nature of the charges against him, (2) the possible penalties, and (3) the dangers and disadvantages of self-representation. *McCormick v. Adams*, 621 F.3d 970, 977 (9th Cir. 2010) (citations and internal quotation marks omitted).

Even if the advisement of rights was insufficient, the Supreme Court "has not told us whether a trial court's failure to give proper [*Faretta*] warning automatically vitiates the waiver." *Cordova v. Baca*, 346 F.3d 924, 926 (9th Cir. 2003). In the absence of clearly established Supreme Court law compelling relief, it is unavailable on these grounds. Further, "[t]he effect of a defective waiver *colloquy* presents a distinct issue from the effect of a defective *waiver* itself; a defective waiver colloquy 'will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver.'" *McCormick*, 621 F.3d at 979 (quoting *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir. 1987)). Thus, the Ninth Circuit has held that "a state would be entitled to conclude that a defective waiver colloquy does not automatically result in a defective waiver" where the waiver was nonetheless knowing and voluntary. *McCormick*, 621 F.3d at 979.

### b. Analysis

Here, the record demonstrates a fully knowing and voluntary waiver of counsel. At pre-trial proceedings on August 28, 2012, the following exchange occurred between Petitioner, Martin

James Martinez, Esq. (who was Petitioner's previous defense counsel), and the state trial court:

THE COURT:  Good Morning.  How do you wish to proceed today?

MR. MARTINEZ:  Your Honor, we're proceeding with a *Faretta* motion and I think Mr. McClendon has filled out all the *Faretta* forms.

(Pause in the proceedings).

MR. MARTINEZ:  Your Honor, if I may—forgive me but I took the form to Mr. McClendon Friday; and he did not fill it out.  He filled out his own form.

THE COURT: Okay.  We'll hand him the Court's *Faretta* form.

MR. MARTINEZ:  Your Honor, he doesn't want to fill out the form.

THE DEFENDANT:  Your Honor, I have a *Marsden* form.

MR. MARTINEZ:  Your Honor, he filled out an in pro per form, his own form—

THE COURT:  I would like him to fill out the Court's *Faretta* form.  If you brought it to him, he can do that.

(Pause in the proceedings).

THE COURT:  Mr. McClendon if you can't follow instructions and fill out a form, I have grave doubts about your ability to—

THE DEFENDANT:  —(unintelligible)—

THE COURT: —Excuse me.  You were interrupting.  That also is not permitted in court.  You will be sanctioned.  I have grave doubts about you representing yourself if you can't fill out a simple form.  Please sit down, read and fill out the court's *Faretta* form and we'll talk about it when it's filled out.

THE DEFENDANT:  I am saying I filled the papers out.  I was saying that that wasn't what I wanted to do.  I wanted to do— I had the pro per papers there as well.  I had them already.  He had these; it's almost the same thing.  This pro per paper almost says the same thing.

THE COURT:  They're very similar; but I am asking you to fill out the court's *Faretta* form.  Please sit down and fill it out carefully.  You are facing life.  Mr. Martinez, we'll pass this matter.

(Whereupon a break was taken).

16

THE COURT:  Has Mr. McClendon filled out his *Faretta* form?

(Pause in the proceedings).

MR. MARTINEZ:  Yes, your Honor.

THE COURT:  All right.  (Reads).  Mr. McClendon I have in front of me a two-page waiver form in which you are agreeing to waive your right to counsel.  Are these your initials and your signature on the form?

THE DEFENDANT:  Yes.

THE COURT:  Did you read it and did you understand it?

THE DEFENDANT:  Yes.  I read it previously.

Answer, Ex. B, Aug. 28, 2012 RT 2-4.

The record shows that Petitioner's executed *Faretta* form indicates that he was fully informed in waiving his right to counsel, including being fully informed of his constitutional rights and of all the dangers and disadvantages to self-representation.  Answer, Ex. A, Clerk's Transcript ("CT"); 1CT 106-109.  Following Petitioner's signing of the *Faretta* form, the trial court orally advised him of the dangers of self-representation in light of the possibility of life in prison that he faced, stating as follows:

THE COURT: You did not write down what the consequences would be if you are convicted of these charges.  Do you know what the consequences will be?

THE DEFENDANT: Life in jail.

THE COURT: Life in prison.  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And do you understand you will be isolated, possibly housed with one other sex offender, kept in a cell 23 hours a day, released for one hour a day for the remainder of your life?

THE DEFENDANT: Yes.

Aug. 28, 2012 RT 4-5.  Furthermore, in his colloquy with the court, Petitioner confirmed and

acknowledged that: (1) he was willing to forgo Mr. Martinez's experience as a trial attorney and "be up against a deputy district attorney with the same skills and experience"; (2) once he waived the right to counsel, he did not have a right to reappointment of counsel; (3) the Court "ha[d] different ways to restrain [him] and prohibit [him] from misbehaving in court"; and (4) there were "consequences" and various risks to self-representation, including that he needed "very good reason[s]" for seeking pro per privileges and that he would not receive any "special privileges or extra time to prepare [his] case." Aug. 28, 2012 RT 4-7. Petitioner acknowledged understanding of all these risks. Aug. 28, 2012 RT 4-7. In response to the court's *Faretta* advisement, Petitioner consistently answered in the affirmative, indicating that he understood and wanted to proceed with the waiver of his right to counsel. Aug. 28, 2012 RT 4-7. The court clarified that Petitioner was making the waiver knowingly and voluntarily, stating as follows:

> THE COURT:  You are facing life in prison without any possibility of ever getting out to see freedom and you are choosing to represent yourself.  And that's your choice.  Is that clear?
>
> THE DEFENDANT: Yes.
>
> THE COURT: So when this comes down the line, you can have this read back to you and be reminded that you made this choice freely and voluntarily.  Is that so?
>
> THE DEFENDANT: Yes.

Aug. 28, 2012 RT 6. Finally, the court also asked whether Petitioner had "ever been under the care of a psychiatrist" or "ever used psychotropic medications," and he said no to both. Aug. 28, 2012 RT 6-7. The record thus shows that Petitioner made an unequivocal, knowing, and voluntary waiver of his right to counsel at trial.

Petitioner argues that the trial court *coerced* him to sign the *Faretta* waiver by "demand[ing] that [he] fill-out [the] Superior Court['s] 'Faretta' Waiver' form." Doc. No 1 at 20-21. It seems that Petitioner also claims that the trial court committed "error" when it chose "not to entertain [his] 'Marsden Motion.'" *Id.* To the contrary, nothing in the record suggests that Petitioner's waiver of counsel was coerced. Nor does that record show that Petitioner requested a

hearing to substitute counsel under *People v. Marsden*, 2 Cal. 3d 118 (1970), or that even if such a request was made, the trial court improperly denied it. Rather, as explained above, the record shows that the trial court made it clear to Petitioner that he was required to fill out the appropriate *Faretta* form if he wished to represent himself, and after Petitioner did so, the court sufficiently advised him of the risks of self-representation in light of a possible life sentence. Aug. 28, 2012 RT 4-7. Petitioner's sole mention of anything related to a *Marsden* motion was that he had already filled out a "*Marsden* form," which he believed was sufficient to make a *Faretta* request because it was "almost the same thing." Aug. 28, 2012 RT 2. However, Petitioner's conduct and statements to the trial court made it clear that he intended to file a *Faretta* motion, not a *Marsden* motion. Aug. 28, 2012 RT 4-7. Additionally, as trial commenced with pre-trial motions on October 1, 2012, Petitioner acknowledged that he was proceeding without appointed counsel and that he was representing himself, which means that no such hearing to substitute counsel pursuant to *Marsden* was needed. *See* Answer, Ex. B, Reporter's Transcript ("RT"), 1RT 6. Specifically, the trial court stated: "The record should reflect Mr. McClendon again is in Pro Per status according to my review of the file. A *Faretta* motion was granted by Judge Maier on August the 28th of this year." 1RT 6. When the court asked for his "readiness status for trial," Petitioner responded, "I'm ready." 1RT 6. Thus, the record shows that Petitioner did not: (1) disagree with the court's assessment that he was proceeding without appointed counsel; (2) attempt to withdraw his prior *Faretta* waiver; or (3) demand that a *Marsden* hearing should have been conducted. *See Johnson v. Paramo*, 2015 U.S. Dist. LEXIS 39594, *60-61 (E.D. 2015) (Defendant abandoned *Marsden* motion by failing to pursue initial request). Therefore, the record defeats Petitioner's claim that the trial court coerced him to sign the *Faretta* waiver. Instead, the record reflects that he made an unequivocal, knowing, and voluntary waiver of his right to counsel. *See Faretta*, 422 U.S. at 835.

Even assuming Petitioner was attempting to pursue a *Marsden* motion because he was unsatisfied with Attorney Martinez's performance, "[e]lecting self representation over

unsatisfactory–but constitutionally sufficient–counsel does not make a defendant's waiver of counsel involuntary." *Arrendondo v. Neven*, 763 F.3d 1122, 1136 (9th Cir. 2014). It is not clear that the Supreme Court has established that a *Faretta* waiver is involuntary if the alternative is constitutionally inadequate counsel. *Id.* The trial court is not required to inquire into the reasons why a defendant wants to represent himself; that duty arises only when defendant seeks to substitute counsel. *See Cook v. Schriro*, 538 F.3d 1000, 1016 (9th Cir. 2008) (rejecting claim that *Faretta* waiver was not voluntary because pretrial counsel's alleged ineffectiveness forced him to choose to represent himself). However, as mentioned above, there is no indication in the record that Petitioner sought to *substitute* counsel pursuant to *Marsden*. In view of the clear record, fair-minded jurists could not find that the state courts' rejection of Claim One was inconsistent with Supreme Court precedent. *See Richter*, 562 U.S. at 102. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2. Ineffective Assistance of Appellate Counsel (Claim 2)

Petitioner contends that he was deprived of effective assistance of appellate counsel when counsel failed to raise the *Faretta/Marsden* claim on direct appeal. Dkt. No. 1 at 5, 22-25. As explained above, Petitioner raised Claim Two in a motion to recall the remittitur in the California Court of Appeal and in a subsequent petition for review in the California Supreme Court. The state courts denied the claim summarily. As such, there is no reasoned opinion addressing Claim Two. However, even under an independent review of the record, Petitioner is not entitled to federal habeas relief on this claim.

#### a. Applicable Federal Law

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that

counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

### b.    Analysis

Here, Petitioner fails to meet either prong. Specifically, Petitioner cannot demonstrate that appellate counsel acted unreasonably by failing to raise the *Faretta/Marsden* claim on direct appeal, or that he was prejudiced by counsel's conduct. As the Court has found above, Petitioner's allegations that his waiver of counsel was coerced and that he was denied a *Marsden* hearing are not supported by the record. As such, appellate counsel acted reasonably in not raising Petitioner's meritless *Faretta/Marsden* claim on appeal. Further, the Court finds no basis to conclude that if appellate counsel had raised this meritless claim, Petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86.

In sum, appellate counsel's failure to raise the *Faretta/Marsden* claim was neither unreasonable nor prejudicial. Based on the foregoing, the state courts' rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 100-03. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### 3.    Exclusion of Victim's Medical Records (Claim 3)

Petitioner claims his constitutional right to present a defense was violated when the trial court excluded evidence from the victim's medical records.[6] Dkt. No. 1 at 5, 51-64. More

---

[6] On September 10, 2018, Petitioner filed a request to supplement his argument for Claim 3 with "one sheet of paper, a transcript from the testimony of the complaining witness . . . [that] goes with the argument concerning the trial court erring in excluding medical evidence." Dkt. No. 19 at 1. However, the full trial record, which includes the entire transcript of the victim's testimony, has been provided to the Court. *See* 2RT 351-401. There is no need for Petitioner to supplement the record further with one page from the transcript. Therefore, his request to supplement the record is denied as moot. Dkt. No. 19.

specifically, Petitioner alleges that a portion of the excluded medical records would have shown that the victim did not report having a sore throat, which would have contradicted her claim of having been choked. *Id.* While Petitioner also argued that the medical records "contained references to negative results regarding strangulation *and* sexual injuries," the majority of his arguments in support of this claim center around the medical records with negative results for sore throat, which he claims would have "bolstered the theory that [the victim] conjured up her story against [Petitioner.]" *Id.* at 57, 60.

### a.     State Court Opinion

The state appellate court described the factual background on this claim and rejected it as follows:

> Appellant contends the trial court erred in excluding evidence of Doe's medical records that he maintains were admissible as business records under Evidence Code section 1271.[FN 3]  He urges that the exclusion of this evidence violated his constitutional right to present a defense.
>
> > [FN 3]: Further statutory references will be to the Evidence Code unless otherwise specified.
>
> During his cross-examination of Doe, after confirming her testimony that when she went to Kaiser she reported having a "very sore throat from being strangled," appellant sought to read and question her about portions of her medical records indicating that she "tested negative for a sore throat in all of her reports, showed no signs of pain to her throat." The prosecutor raised a hearsay objection, stating that appellant would be "more or less testifying on the part of the doctor. We don't know in what phrase those questions were asked or answers were given, and because of that, she can't possibly testify to what the doctors wrote down in the notes." When the prosecutor indicated there were no plans to put the medical records into evidence, the court ruled that the statements appellant wished to read were hearsay and told appellant he could not refer to the records.
>
> Later, appellant asked whether he would be able to present medical records in his defense. Appellant wanted to point out a reference in the Kaiser records to "no hoarseness."[FN 4] He also wanted to use pages from the CCRMC records that "say negative with everything.... I wanted to read the results, negative for the CT scans and everything. They came back with nothing."[FN 5] The court asked if there was any reason the records could not be admitted and the prosecutor replied, "Other than the fact that they're kind of unintelligible evidence without someone explaining their significance; just allow the jury to speculate. [¶] I don't know if anybody knows the significance of a negative CT scan." Appellant argued, "A negative—it's not rocket science. CT scan is for the neck and the neck which has to deal with strangulation and everything was fine." The prosecutor agreed that the results of the CT scan were admissible over a hearsay objection because the medical records were produced pursuant to a subpoena, but argued that the jury would not be able to understand the significance of the results without medical testimony and would

"leap to conclusions" about their meaning, and that appellant was not entitled to argue that the negative CT scan was inconsistent with Doe's testimony about strangulation because this would be a medical opinion. When appellant reiterated that "people understand what negative means," the court stated that it understood the prosecutor's concern because "I do know what that means, but in terms of having any kind of medical background, it doesn't have any significance to me one way or the other."

> [FN 4]: The Kaiser report includes the statement, "Pt c/o mild Rt shoulder pain, some mild o[d]ynophagia [painful swallowing], but no hoarseness." A list of the symptoms Doe reported when she was evaluated at Kaiser indicates, "[n]egative for headaches, nosebleeds, congestion and sore throat."

> [FN 5]: The CCRMC records include, "At this point in time, patient reports neck discomfort from the choking ... [d]enies any re[s]piratory difficulty, phonation difficulty but reports pain with swallowing. Denies any headaches, photophobia or neck stiffness.... She has no cervical, thoracic, or lumbosacral spine tenderness but she does have some soft tissue swelling with an abrasion/bruise noted in the left lower neck anteriorly."

After the prosecutor ascertained that the sexual assault nurse would be able to testify as to whether a normal CT scan was consistent or inconsistent with the history Doe provided, the court indicated that the two-page CT report included in the medical records could be admitted. The report concludes with the statement, "No acute osseous or soft tissue pathology identified." The nurse testified on direct examination that a normal neck CT was not inconsistent with the report of strangulation and that it was standard practice to do a CT when strangulation was reported because, depending on the type of strangulation and amount of pressure used, there could be broken bones in the neck or swelling that might impair the airway. Appellant chose not to put the CT report into evidence after an exchange in which the court told him that "the reports themselves" were hearsay.[FN 6]

> [FN 6]: By appellant's description, he withdrew the evidence in frustration after the court told him the reports were still hearsay and he "could not argue contradictions from the evidence to the jury." It is less than clear exactly what was being discussed when appellant made his decision. Immediately after appellant completed cross-examining Officer Choe about his interrogation, the court and parties discussed exhibits to be admitted in evidence. The court indicated that the two-page CT report could be marked as defense exhibit M. Appellant asked, "Am I allowed to use the comparisons between testimony and what was said on the actual reports from the officers that contradict things?" The court told him the reports were hearsay but could have been used to cross-examine the officers. Appellant said, "[n]ot the officer. I'm talking about the statements of the accuser, things she said that don't match up with[.]" The court reiterated that "the reports are hearsay unless it came out in the testimony somehow. You could certainly comment on whatever evidence that was received in the trial that may be contradictory to other evidence received in the trial. But the reports themselves are hearsay." When appellant asked, "[h]ow do I receive testimony from the officers?" the court said it could not give him legal advice, but his closing argument had to be based on evidence or logical inferences drawn from evidence. Exhibit M was then marked for identification and appellant stated he would not be using it.

*McClendon*, 2015 WL 5257759, *8-9 (footnotes in original and brackets added).

The state appellate court then set forth the relevant state and federal law, and it denied this

23

claim as follows:

> Section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

"Hospital records are often admissible under the business records exception to the hearsay rule, assuming a custodian of records or other duly qualified witness satisfies the requirement of the exception. (§ 1271.) Compliance with a subpoena duces tecum often dispenses with the need for a live witness to establish the business records exception. (§ 1560 et seq.)" (*In re R.R.* (2010) 187 Cal. App. 4th 1264, 1280.) But when these records are based on hearsay, an independent exception to the hearsay rule is required for each level of hearsay. (*People v. Ayers* (2005) 125 Cal. App. 4th 988, 995.) Here, appellant sought admission of portions of the hospital records documenting the symptoms Doe reported when she went to Kaiser. Respondent asserts that even if the hospital records themselves were admissible because they were produced pursuant to a subpoena, Doe's statements regarding her symptoms were hearsay not subject to any exception.

We need not determine whether the trial court erred in finding the Kaiser records inadmissible because any error in excluding this evidence was harmless under any standard of review. As a result of the ruling, the jury did not see the Kaiser records indicating that Doe did not report having a sore throat; appellant was not able to confront Doe with any inconsistency between her trial testimony that her throat hurt when she went to Kaiser and indications in the records that she did not report this symptom; and appellant was unable to use the records to argue to the jury that such inconsistency undermined Doe's credibility or that her failure to report throat pain demonstrated she had not been strangled. But the medical records in fact documented that Doe did report throat pain both at Kaiser and later at CCRMC, and, in any event, the evidence she had been strangled was overwhelming.

First, while the pages of the Kaiser records to which appellant draws our attention indicated Doe did not report a "sore throat" or "hoarseness," they did document her report of "mild odynophagia," or painful swallowing, and other pages of the same records reflect that Doe did report throat pain. Under the section heading "Medical," the Kaiser records state "pt reports pain to throat and tongue," with a patient-reported pain rating of three on a scale of one to ten. "Flowsheet Data" documenting the Kaiser assessment, under "Pain Assessment," reflects "aching" throat pain with a pain score of five at 11:09 a.m., 1:00 p.m. and 3:00 p.m., then a score of four for aching throat pain at 3:15 p.m. The flowsheet data, for "eyes, ears, nose, and throat assessment," documents "denies symptoms" at 1:00 p.m. and 3:15 p.m. The CCRMC records state that Doe reported "reports neck discomfort from the choking" and "pain with swallowing." Rae, the nurse who performed the SART examination, testified that Doe reported her neck and throat were hurting while she was being choked, and that during the examination Doe was "given a trial of ice chips to try to swallow them because her throat hurt so bad."[FN 7]

> [FN 7]: The medical records' simultaneous indication that Doe reported throat "pain" but denied a "sore" throat illustrates the basis for the prosecutor's objection that to allow appellant to argue the significance of the notations in the records that Doe was "negative" for sore throat would be to allow appellant to testify "on the

part of the doctor." One possible explanation is that Doe was distinguishing between the "aching" throat pain she attributed to being choked from the "sore throat" one might have with a cold or other illness. In the absence of testimony to explain the context and import of the medical notes, there would have been no basis for appellant to argue any particular conclusion from these records.

In addition to the fact that the medical records clearly documented Doe complaining of neck and throat pain, there was abundant other evidence that Doe was choked. The petechiae Rae saw on Doe's face and inner eyelids were consistent with strangulation and indicated "a lot of pressure" was used. Rae found injuries to Doe's tongue and lip that were consistent with Doe's report of biting down on her tongue, and testified that biting the tongue was consistent with someone being choked. The loss of bladder control Doe reported was also consistent with being choked, the result of the brain being deprived of oxygen. Rae also found two reddened abraded areas on Doe's neck, an injury Rae testified was not unusual in a strangulation case and could result from the assailant's fingers or the victim trying to claw the hands off the neck.[FN 8]  Doe was reluctant to drink because it had hurt when she tried to swallow pudding at Kaiser, Rae saw Doe grimace when she tried to swallow, and Doe's voice was raspy; Rae testified that both difficulty swallowing and a raspy voice are consistent with being strangled. Rae also testified that the fact the CT scan did not find any abnormalities was not inconsistent with a history of strangulation, as a person can have trouble swallowing after strangulation if there is no damage to the trachea.

> [FN 8]: Under "Physical Examination," the CCRMC records state that Doe had "some soft tissue swelling with an abrasion/bruise noted in the left lower neck anteriorly."

Aside from all this evidence, in the recorded phone call appellant did not deny strangling Doe, and in his police interview he admitted doing so.

At most, the medical records appellant sought to place in evidence would have supported—though certainly not compelled—an inference that Doe was inconsistent in reporting her symptoms at Kaiser. And despite the court's ruling, appellant argued in his closing that Doe's first complaint at the hospital was that she was raped, not that her throat hurt; that Rae confirmed the CT scan of Doe's neck was negative, there was no damage to Doe's trachea and there was "nothing wrong with her neck at all"; and that the doctor at Kaiser said there was "no hoarseness."

Given the many references to throat pain in the medical records and the other evidence of Doe's physical condition supporting her report of being strangled, it is clear that any error in failing to admit the requested records into evidence did not affect the verdict.[FN 9]

> [FN 9]: Appellant describes this as a close case based on weak evidence, urging that it is clear the jury did not find Doe's testimony "completely credible" because its deliberations lasted as long as the presentation of evidence, the jury requested transcripts of Doe's and appellant's testimony regarding June 3 and readback of Rae's testimony about Doe's report of the "sequence of events of events regarding sex and oral sex" and the jury acquitted appellant of "most of the charges." The factors appellant describes, however, do not necessarily indicate a rejection of Doe's credibility. The jury accepted Doe's claim that appellant forcibly raped and orally copulated her after tying and binding her, and inflicted corporal injury upon her. With respect to these offenses, the jury found in appellant's favor only in rejecting the allegations that he inflicted great bodily injury. This conclusion

25

depended not on Doe's testimony but on the legal significance of her injuries. The acquittal on the charge of attempted murder does not necessarily mean the jury disbelieved Doe's account; it might simply mean the jury did not believe the prosecution had proved beyond a reasonable doubt that appellant intended to kill Doe. The acquittal on the charge of threatening a witness says nothing about the jury's evaluation of Doe's credibility in describing the charged offenses; it was based on a letter appellant wrote.

*Id.* at \*9-11 (footnotes in original and brackets added).

### b.    Applicable Federal Law

A state court's procedural or evidentiary ruling may be subject to federal habeas review if it violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986). A federal court can disturb on due process grounds a state court's procedural or evidentiary ruling only if the ruling was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.) *cert. denied*, 479 U.S. 839 (1986).

Further, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding due process does not guarantee defendant right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *Egelhoff*, 518 U.S. at 42 (holding that exclusion of evidence does not violate due process unless "it offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental.").  But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to defense violated right to present evidence).

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000) (same).  The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based.  *See Chia*, 360 F.3d at 1006; *Miller*, 757 F.2d 988, 995 (9th Cir. 1985).  The *Miller* balancing test, however, is a creation of circuit law and, consequently, is not "clearly established Federal law" for purposes of habeas corpus review under 28 U.S.C. § 2254(d)(1).  *See Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009).  Thus, because the Supreme Court has considered whether an evidentiary rule, by its own terms, violated a defendant's constitutional right to present evidence, but has not directly considered whether a trial court's exercise of discretion to exclude evidence, under a constitutionally sound evidentiary rule, violated a defendants' constitutional right to present evidence, a state court's failure to apply the *Miller* balancing test is not contrary to or an unreasonable application of clearly established Supreme Court precedent.  *See id.* at 758-59.

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht*.  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

### c.      Analysis

In Claim 3, Petitioner argues that the trial court erred in excluding evidence from Jane

Doe's medical records—specifically records "which contained references to negative results regarding strangulation and sexual injuries"—because they were admissible under the business records exception to the hearsay rule under California Evidence Code § 1271. Dkt. No. 1 at 53, 60. In his petition, Petitioner elaborates on the importance of the medical records to his defense as follows:

> In the instant case, the complainant testified that the sexual and violent acts had occurred, but there was inconclusive corroborating forensic evidence. Appellant tried to present evidence to support that lack of injury, which would corroborate his defense and damage or destroy the complainant's credibility. He needed to counter testimony that despite Doe's allegations that she had been choked, there was no hoarseness and findings were negative for sore throat. (2RT 526, 533-534.) Appellant needed the report to support that it was consensual sex and lack of violent intent or actions on his part and counter Doe's testimony with the corroborating medical evidence. (See, SACT pp. 12-14 (sealed record).)

*Id.* at 57. Petitioner also contends that the exclusion of the medical records (including the two-page CT report) violated his constitutional right to present a defense. *Id.* at 55-56.

First, to the extent Claim 3 alleges a violation of state law, such a claim fails because a state evidentiary rule cannot be the basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for violations of state law or for alleged error in the interpretation or application of state law). As such, Petitioner may not challenge the trial court's evidentiary ruling on the grounds that it violated the state's evidence code. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Further, the failure to comply with a state's rules of evidence is neither a necessary nor sufficient basis for granting federal habeas relief, and indeed the presence or absence of a state law violation is irrelevant. *Id.*; *see also Estelle*, 502 U.S. at 67-68.

Even if the claim is cognizable in federal habeas, the state appellate court reasonably rejected it. As mentioned above, at trial, Petitioner sought to admit portions of the medical records indicating that the victim "tested negative for a sore throat in all of her reports [and] showed no signs of pain to her throat," thus contradicting her testimony that she had been strangled. *McClendon*, 2015 WL 5257759, *8. The trial court excluded the medical records on the basis that introducing these statements without any expert testimony to explain their meaning to the jury was

28

unwarranted. *Id.* The state appellate court did not reach the question whether the trial court had erred in finding the medical records were inadmissible but found that "any error in excluding this evidence was harmless under any standard of review." *Id.* at *9.

Applying the required standard of heightened deference in evaluating the state court decision, the Court finds the state appellate court's rejection of this claim was not unreasonable. Even if Claim 3 is considered under *Miller*'s balancing test, the Court does not find that Petitioner's due process rights were violated by the exclusion of medical records. As mentioned above, Petitioner asserts that the medical records "which contained references to negative results regarding strangulation and sexual injuries" were necessary to attack the victim's credibility. Dkt. No. 1 at 53. Accordingly, the Court considers the weight of this evidence on the central issue of the victim's credibility in applying the *Miller* balancing test: (1) the probative value of the excluded evidence was minimal because the defense theory that the victim lied about the strangulation and sexual injuries relied on the fact that she merely gave purportedly inconsistent statements when reporting her symptoms; (2) Petitioner offered no other evidence to support the defense theory regarding the victim's lack of credibility based on her inconsistent statements to medical personnel, and therefore the reliability of such inconsistent statements in the medical records was low; (3) whether the medical records—such as the negative CT report—were capable of evaluation by the trier of fact is questionable because such records required explanation from a medical professional and could cause the jury to speculate and make conclusions jurors are not capable of making; (4) the defense attacked the victim's credibility through extensive cross-examination regarding inconsistencies between her statements describing the strangulation and sexual injuries, and therefore the excluded evidence was cumulative as impeachment material; and (5) the only factor weighing favor of Petitioner is that he claims that the excluded medical records evidence constituted a major part of the attempted defense, which was speculative for the reasons noted above. *See Chia*, 360 F.3d at 1004. With only one of these factors weighing in Petitioner's favor, it cannot be said that the exclusion of the medical records violated Petitioner's rights to a

fair trial and to present a defense under *Miller*. *Id.*

In addition, the decision to exclude the medical records was not so prejudicial that it rendered the trial fundamentally unfair. As the state appellate court noted, other portions of the medical records not referenced by Petitioner contained many references to the victim having reported painful swallowing and throat pain. *McClendon*, 2015 WL 5257759, *10. And the CCRMC records reflected that the victim had reported "neck discomfort from the choking" and "pain from swallowing." *Id.* Nurse Rae also testified that during the SART examination, the victim reported her neck and throat were hurting from being choked, and that she tried swallowing ice chips to alleviate some pain. *Id.* The state appellate court found that in addition to the medical records which significantly documented the victim's symptoms of neck and throat pain, there was other physical evidence consistent with strangulation—broken capillaries around her face and eyelids, biting injuries to her tongue and lip, the loss of bladder control, bruising around her neck, painful swallowing, and a raspy voice. *Id.* There was also evidence from the recorded phone call where Petitioner did not deny strangling Jane Doe and his police interview where he admitted to doing so. *Id.* at *11.

Based on the foregoing, the state appellate court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 4. Admission of Prior Domestic Violence Incidents (Claim 4) and Instructional Error (Claim 5)

In Claim 4, Petitioner claims that the trial court inappropriately admitted inaccurate evidence of his prior uncharged acts of domestic violence, thereby abusing its discretion under California Evidence Code §§ 1109 and 352. Dkt. No. 1 at 6, 65-72. Petitioner further claims that his federal due process rights were violated by the admission of this propensity evidence, rendering his trial fundamentally unfair. *Id.*

Claim 5 is related to Claim 4 because Petitioner claims that the trial court's erroneous

CALCRIM No. 852 instruction allowed the jury to infer guilt on all of the charges based on a propensity to commit domestic violence. Dkt. No. 1 at 6, 73-78. Petitioner further claims his federal due process rights were violated because the instructions misrepresented the prosecution's burden of proof. *Id.*

In one section of its decision, the state appellate court resolved both Petitioner's challenges to the evidence and instructions on the use of the evidence of uncharged domestic violence. Thus, this Court will do the same and resolves Claims 4 and 5 below.

### a.    State Court Opinion

The state appellate court outlined the applicable state law, including the relevant state cases, and rejected both Claims 4 and 5 as follows:

> Appellant also contends the trial court abused its discretion in permitting the prosecution to present evidence of several uncharged incidents of domestic violence by him against Doe. When appellant sought exclusion of this evidence before trial, the court found under section 352 that it had significant probative value that was not outweighed by prejudice and that it would not be unduly time consuming.

> Section 1109, subdivision (a)(1), provides: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 [evidence of other crimes to prove conduct] if the evidence is not inadmissible pursuant to Section 352." Section 352 gives the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

> Noting that evidence is admissible only if it is relevant to a disputed material issue in the case (§ 350), appellant argues that the evidence of past incidents of domestic abuse were relevant to only one of the six counts with which he was charged. As to the other five counts—rape, oral copulation, attempted murder and intimidating a witness—appellant urges the prior domestic abuse evidence was not probative and was unduly prejudicial. Although the prosecutor argued that all the counts involved domestic violence, the trial court ruled the evidence of uncharged domestic violence would be limited to the single "specific charged act of domestic violence."

> Section 1109 creates an exception to the rule that evidence of prior criminal acts is generally inadmissible to show a defendant's propensity to commit such acts. (*People v. Brown* (2011) 192 Cal. App. 4th 1222.) Analogous exceptions have been established for evidence of prior sexual offenses committed by the defendant in a sexual offense case (§ 1108), prior abuse of an elder or dependent person by a defendant charged with abuse of an elder or dependent person (§ 1109, subd. (a)(2)) and prior child abuse by a person charged with an offense involving child abuse (§ 1109, subd. (a)(3)). The California Supreme Court, in *People v. Falsetta* (1999) 21 Cal. 4th 903, 907, held that section 1108

does not violate the constitutional guarantee of due process largely because the retention of the trial court's discretion to exclude evidence under section 352 provides a "safeguard" against use of the other crimes evidence in cases where admission could result in a fundamentally unfair trial. (*Falsetta*, at pp. 916-917.) As we observed in *People v. Johnson* (2010) 185 Cal. App. 4th 520, 529, the courts of appeal have uniformly followed the reasoning of *Falsetta* in upholding the constitutionality of section 1109.[FN 10]

> [FN 10]: Recognizing this point, appellant challenges the constitutionality of section 1109 only to preserve the argument for federal review.

The legislative history of section 1109 explains the rationale for applying special evidentiary rules in domestic violence cases. We have previously noted the explanation in one bill analysis that "'evidence of other acts is important in domestic violence cases because of the typically repetitive nature of domestic violence crimes, and because of the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved.'" (*People v. Brown* (2000) 77 Cal. App. 4th 1324, 1333, quoting Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, p. 4.) This legislative analysis further explained: "[T]he legislative history of the statute recognizes the special nature of domestic violence crime, as follows: 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. [ ] on Public Safety[, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996,] pp. 3-4.)" (*People v. Johnson* (2000) 77 Cal. App. 4th 410, 419; *People v. Brown, supra*, 192 Cal. App. 4th at pp. 1235-1236.)

"'[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' (*People v. Johnson*[, *supra*,] 77 Cal. App. 4th [at p. 420].) Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' (*People v. Hoover* (2000) 77 Cal. App. 4th 1020, 1024; see also *People v. Soto* (1998) 64 Cal. App. 4th 966, 979-981 [history of section 1108].) '[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited.' (*People v. Brown*[, *supra*,] 77 Cal. App. 4th [at pp.] 1333-1334.)" (*People v. Brown*, *supra*, 192 Cal. App. 4th at pp. 1232-1233.)

Here, the evidence of prior domestic violence was clearly relevant to the charged infliction of corporal injury to a cohabitant. All the incidents involved the same victim and occurred within 14 months of the charged offenses. The prior incidents were thus highly probative of appellant's propensity to commit violent acts against Doe, allowing the jury to evaluate the present charge in the context of appellant and Doe's overall relationship. The prior incidents, all of which involved appellant restraining, pushing and shoving Doe, were not

unduly prejudicial; rather, they were far less inflammatory than the charged offenses. The evidence was not unduly time consuming: Each of the four incidents was described by Doe and corroborated by brief testimony from the police officers who responded on each occasion.

Appellant maintains that the evidence should have been excluded because it had no probative value, and was unduly prejudicial, with respect to the majority of the charges against him. " ' " ' The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*People v. Branch* (2001) 91 Cal. App. 4th 274, 286.) In appellant's view, his trial was rendered fundamentally unfair because the evidence of past domestic violence allowed the jury to convict him of the sexual offenses based on the "extraneous factor[]" of his propensity to commit domestic violence.

The jury was instructed pursuant to CALCRIM No. 852 that if it found the prosecution proved the uncharged domestic violence by a preponderance of the evidence, it could, but was not required to, conclude appellant was "disposed or inclined to commit domestic violence and, based on that decision, also conclude that [appellant] was likely to commit and did commit [the offense] in Inflicting Corporal Injury to Cohabitant, as charged here, or the lesser-included offense of Battery of a Cohabitant. If you conclude that [appellant] committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Inflicting Corporal Injury to Cohabitant, or of the lesser-included offense of Battery on the Cohabitant. The People must still prove the charge beyond a reasonable doubt."[FN 11] The prosecutor, in closing argument, reiterated this point, telling the jurors that if they decided appellant committed the uncharged domestic violence, "you may but are not required to conclude ... from that evidence that the defendant was disposed or inclined to commit domestic violence" and "also to conclude that the defendant was likely to commit and did commit count 5 as charged here. That's the corporal injury to cohabitant."

[FN 11]: CALCRIM No. 852, as given in this case, provides in full:

"The People have presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: incidents that allegedly occurred on the following dates:

"April 18, 2011, May 25, 2011, July 10, 2011, and April 7, 2012.

"Domestic violence means abuse committed against an adult who is the cohabitant or former cohabitant of the defendant.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"The term cohabitant means two unrelated persons living together for a substantial period of time, resulting in some permanency of the relationship. Factors that may determine whether people [are] cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same residence, (2) sharing

33

of income or expenses, (3) joint use or ownership of property, (4) the parties' holding themselves out as husband and wife, (5) the parties' registering as domestic partners, (6) the continuity of the relationship, and (7) the length of the relationship.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit Inflicting Corporal Injury to Cohabitant, as charged here, or the lesser-included offense of Battery of a Cohabitant. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Inflicting Corporal Injury to Cohabitant or of the lesser-included offense of Battery on the Cohabitant. The People must still prove the charge beyond a reasonable doubt."

The form instruction includes an optional last sentence: "[Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>* ].]" The Bench Notes to CALCRIM No. 852 state, "Give the final sentence that begins with 'Do not consider' on request."

The jury instructions, emphasized by the prosecutor's argument, directed the jurors that they were permitted to consider evidence of appellant's propensity to commit domestic violence as evidence that he committed only one of the charged offenses, the corporal injury to cohabitant charged in count 5. The instruction singled out this offense and nothing in this or any other instruction suggested the uncharged domestic violence evidence could be used as a basis for finding appellant guilty of the other charged counts. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal. 4th 834, 852.)

Appellant urges that the jury instruction did not adequately restrict the jury's consideration of the domestic violence evidence to the domestic violence count because the court failed to include the optional last line of CALCRIM No. 852, which reads: "[Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>* ].]"[FN 12] We disagree. Since there was no "other purpose" the jury needed to be told about, the last line of the instruction would simply have stated, "Do not consider this evidence for any other

34

purpose." This point was implicit in the instruction as a whole: As we have said, the instruction explicitly directed the jury that it could consider the evidence with respect to a single charged offense, necessarily indicating the evidence could not be so considered with respect to the other charged offenses. No other reasonable interpretation of the instruction is possible.

> [FN 12]: Appellant also argues the instruction improperly permitted the jury to infer guilt based on propensity rather than proof of the elements of the charged offenses, effectively lowering the prosecution's burden of proof in violation of his due process rights. Recognizing that the California courts have resolved such challenges to CALCRIM No. 852 and the analogous form instructions concerning evidence of sex offenses under section 1108 against him (*People v. Johnson* (2008) 164 Cal. App. 4th 731, 739 [CALCRIM No. 852]; *People v. [Reliford]* (2003) 29 Cal. 4th 1007, 1012-1016 [CALJIC No. 2.50.01]; *People v. Schnabel* (2007) 150 Cal. App. 4th 83, 87 [CALCRIM No. 1191] ), he raises these issues only to preserve them for federal review.

Although what we have said thus far resolves appellant's challenges to the evidence and instructions on use of the evidence of uncharged domestic violence, we observe that the trial court was mistaken in its belief that this evidence had to be limited to the charge of infliction of corporal injury to cohabitant. The court's ruling on this point was not an exercise of its discretion; its comments make clear that it believed the limitation was required. When the prosecutor urged that the jury should be able to consider the evidence as to the other counts because all "involve[d] domestic violence," the court paused to look at the bench notes and then stated, "Seems to be limited though to charged—a specific charged act of domestic violence as defined by Penal Code Section 13700." The prosecutor argued that the definition in Penal Code section 13700 is "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself or another," and that appellant caused Doe to be placed in fear for the other counts, as well as for count 5 (corporal injury to cohabitant). The court responded, "Well, I'm going to leave it as it is."

Section 1109 permits evidence of other incidents of domestic violence in a prosecution for "an offense involving domestic violence." The statute operates not only in a prosecution for a charge of domestic violence specifically but also where the defendant is charged with a violent offense committed in circumstances that show it was "abuse" committed against a present or former spouse, cohabitant or person with whom the suspect has had a child or a dating or engagement relationship. (§ 1109, subd. (d)(3); Pen. Code, § 13700, subd. (b); *People v. Brown*, *supra*, 192 Cal. App. 4th at p. 1237.)[FN 13] For example, a defendant charged with murdering his former girlfriend after a long period of attempting to intimidate her after she broke up with him "was clearly 'accused of an offense involving domestic violence' within the meaning of section 1109." (*Brown*, at p. 1237.) The *Brown* court agreed with the trial court's observation that "'murder is the ultimate form of domestic violence.'" (*Id.* at p. 1225.) *People v. Poplar* (1999) 70 Cal. App. 4th 1129, 1138-1139, in which the defendant was charged with forcibly raping his girlfriend during an argument after she said she wanted to end the relationship, rejected the argument that section 1109 applies "'to the classic kind of pushing, shoving, hitting, slapping, punching' and not to 'a specific sexual offense such as rape.'" (*Poplar*, at p. 1138.) The court explained, "The definition of domestic violence/abuse ('reasonable apprehension of imminent serious bodily injury to ... herself') encompasses the definition of rape ('fear of immediate and unlawful bodily injury on the person'). Defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, rape is a higher level of domestic violence, a similar act of control." (*Id.* at p. 1139.)

[FN 13:] Section 1109, subdivision (d)(3), provides: "'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."

Penal Code section 13700, subdivision (b), defines "domestic violence" as "*abuse* committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." "Abuse" is defined as "'intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.'" (Pen. Code, § 13700, subd. (a).)

Family Code section 6211 defines "domestic violence" as "abuse" perpetrated against a present or former spouse or cohabitant (Fam. Code, § 6211, subds. (a) & (b)), a "person with whom the respondent is having or has had a dating or engagement relationship" (*id.*, subd. (c)), a "person with whom the respondent has had a child, where the presumption applies that the male parent is the father of the child of the female parent under the Uniform Parentage Act (Part 3 (commencing with Section 7600) of Division 12)" (*id.*, subd. (d)), a "child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected" (*id.*, subd. (e)), or "[a]ny other person related by consanguinity or affinity within the second degree" (*id.*, subd. (f)).

Here, all the offenses appellant was charged with committing against Doe on June 3 "involv[ed] domestic violence." Doe described the offenses, sexual and otherwise, as part of a continuous physical assault that occurred when appellant became upset and angry because he thought Doe was seeing other men. The forcible sex offenses and attempted murder charges, like the charge of infliction of corporal injury on a cohabitant, clearly involved "abuse" committed against a cohabitant. (§§ 1109, subd. (d)(3), Pen. Code, § 13700, subds. (a), (b).) Contrary to appellant's claim that the evidence of uncharged domestic violence had no relevance to the majority of the charges against him, it would have been entirely proper for the court to have instructed the jury that it could consider that evidence with respect to the charges of forcible rape, forcible oral copulation and attempted murder, as well as with respect to the charge of infliction of corporal injury to a cohabitant.

*McClendon*, 2015 WL 5257759, *11-15 (footnote in original and brackets added).

### b.    Challenge to Admission of Propensity Evidence

### i.    Applicable Federal Law

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal*, 926 F.2d at 919-20.  The admission of

36

evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). Evidence violates due process only if "there are *no* permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920 (emphasis in original). Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process. *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)). Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* (quoting 28 U.S.C. § 2254(d)). In addition, the Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) (declining to rule on the constitutionality of propensity evidence); *see also Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006) (recognizing Supreme Court has expressly reserved whether admission of propensity evidence violates due process as an "open question").

### ii. Analysis

Under these binding authorities, the state appellate court's rejection of Petitioner's due process claim does not warrant granting federal habeas relief under AEDPA, because a California

trial court's admission of evidence pursuant to California Evidence Code § 1109 to show propensity does not violate any principle of clearly established federal law. *See Holley*, 568 F.3d at 1101.

While no federal court has specifically ruled on the constitutionality of section 1109, several circuit courts have upheld the use of propensity evidence under Rules 413 and 414 of the Federal Rules of Evidence. *See, e.g.*, *United States v. Castillo*, 140 F.3d 874, 881 (10th Cir. 1998); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998). The Ninth Circuit has upheld the constitutionality of Rule 414, permitting admission of evidence of similar crimes in child molestation cases. *See United States v. LeMay*, 260 F.3d 1018, 1024-25 (9th Cir. 2001), *cert. denied*, 534 U.S. 1166 (2002). The court held in *LeMay* that Rule 414 is not unconstitutional because it is limited in its function by Rule 403. *Id*. at 1026-27. Rule 403 directs judges to exclude any evidence submitted under Rule 414 that is more prejudicial than probative. *Id*. at 1027. The court reasoned that this balancing mechanism eliminates any due process concerns from Rule 414, because "[a]s long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded." *Id*. at 1026.

The reasoning of *LeMay* applies equally to this case, because the California rules are analogous to the federal rules. The admission of evidence under section 1109 is limited by section 352. *See* Evid. Code §§ 1108(a), 1109(a)(1). Section 352 parallels Rule 403 of the Federal Rules of Evidence because it permits a trial judge to exclude evidence when its probative value is substantially outweighed by its prejudicial effect. *See* Evid. Code § 352. As the California Supreme Court held in *Falsetta*, the requirement under section 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted under section 1109 will not infringe on the right to a fair trial guaranteed under the Due Process Clause. *People v. Falsetta*, 21 Cal. 4th 903, 913 (1999).

Finally, as noted above, the United States Supreme Court has never held that the admission

38

of evidence of prior crimes violates the right to due process. *See Estelle*, 502 U.S. at 75 n.5; *Alberni*, 458 F.3d at 864-67. Because habeas relief may not be granted unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, *see* 28 U.S.C. § 2254, and there is no Supreme Court precedent on point, the decision of the appellate court cannot be said to have contradicted or unreasonably applied clearly established federal law in upholding the constitutionality of sections 1108 and 1109. *See Alberni*, 458 F.3d at 866-67 (under AEDPA, habeas relief cannot be granted on claim Supreme Court has reserved); *id.* at 874-75 (although habeas relief may still be available after AEDPA on reserved issues, as to propensity evidence there is insufficient Supreme Court authority of any kind to clearly establish a due process right not to have such evidence admitted) (McKeown, J., concurring in part and dissenting in part). Accordingly, the state appellate court's decision regarding the admission of prior acts of domestic violence was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

Even if Petitioner raised a cognizable due process claim, habeas relief would still be unavailable because the admission of evidence was not arbitrary "or so prejudicial that it rendered the trial fundamentally unfair." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The admission of evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920; *see also Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction). Here, Petitioner previously committed four separate incidents of domestic violence and contends that the evidence of past acts should have been excluded because it lacked probative value and was unduly prejudicial. Each incident involved physical altercations such as restraining or pushing the victim and could be corroborated by police officers who responded to the altercation. *McClendon,* 2015 WL 5257759, *2-3, *13. The state appellate court also noted

that each incident "involved the same victim and occurred within 14 months of the charged offenses[,]" establishing the prior acts as pertinent. *Id.* at *13. Next, because the four incidents involved actions "far less inflammatory than the charged offenses[,]" the admission of this evidence was not unduly prejudicial. *Id.* Finally, the trial court instructed the jury to consider the past acts as a factor for only one of the charged offenses. *Id.* By including these cautionary instructions and balancing the probative weight of the evidence against prejudicial effect, the trial court did not violate Petitioner's due process rights.

In sum, the state appellate court's decision regarding the admission of prior acts of domestic violence was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to habeas corpus relief on Claim 4.

### c. Challenge to Instruction on the Use of Propensity Evidence

### i. Applicable Federal Law

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instruction by itself so infected the entire trial that the resulting conviction violates due process. *See id.* at 72; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009) (internal quotations and citations

omitted).  A "meager 'possibility'" that the jury misapplied the instruction is not enough.  *Kansas v. Carr*, __ U.S. __, 136 S. Ct. 633, 643 (2016) (quoting *Boyde v. California*, 494 U.S. 370, 384 (1990)).

### ii.     Analysis

Here, the state appellate court reasonably rejected Claim 5, in which Petitioner contends that the trial court's jury instruction misrepresented the prosecution's burden of proof and allowed the jury to infer guilt as to all of his charged offenses based on his propensity to commit the crimes.  The trial court's jury instruction "allow[ed], but [did] not require, [the] jury to infer a specified conclusion if the government proved certain predicate acts."  *United States v. Warren*, 25 F.3d 890, 897 (9th Cir. 1994).  The trial court clearly instructed the jury that it could only consider Petitioner's past, uncharged acts of domestic violence "if the People have proved by a preponderance of the evidence that [Petitioner] in fact committed the uncharged domestic violence."  *McClendon*, 2015 WL 5257759, *13 fn. 11.  The trial court also instructed the jury that if it decided the People had shown that Petitioner committed the uncharged domestic violence, the jury "could, but was not required to," find that Petitioner was predisposed to commit domestic violence.  *Id.*  However, the acts of uncharged domestic violence were "only one factor to consider along with all the other evidence," and the People still had to show beyond a reasonable doubt that Petitioner was guilty of inflicting corporal injury on his cohabitant.  *Id.*  Moreover, because the instruction was permissive in nature, the jury was not *required* to consider the evidence.  Accordingly, Petitioner's claim that the trial court's jury instructions lowered the prosecution's burden is unfounded.

Petitioner also contends that by omitting the sentence, "Do not consider this evidence for any other purpose [except for the limited purpose of ___]," the trial court allowed the jury to infer guilt for all the charges.  However, as the California Court of Appeal noted, the jury instructions already specified that the past, uncharged acts of domestic violence were to be considered to establish an inclination only to commit the offenses of "Inflicting Corporal Injury to Cohabitant,"

or "Battery of a Cohabitant." *McClendon*, 2015 WL 5257759, *13, 14 n.12. And the state appellate court noted that there was no "'other purpose'" for the jury to be cautioned about. *Id.* at *14. Unless proven otherwise, jurors are presumed to have followed the instructions given. *Weeks v. Angelone* 528 U.S. 225, 234 (2000). Petitioner has presented no evidence to rebut this presumption.

Finally, Petitioner fails to prove that the instruction had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637-38. Setting aside the prior acts of domestic violence, Petitioner's guilt for the charges could still be properly inferred from the medical reports, expert witness testimony by the SART nurse, and Petitioner's own admissions. The victim's injuries and the SART nurse's testimony corroborated the victim's claims that she was gagged, tied, choked, and sexually assaulted by the Petitioner. More specifically, the victim had petechiae on her face, bite marks on her tongue, and red abrasions on her neck, which were consistent with common bodily responses to strangulation, including self-defense against strangulation. 2RT 508-518. The victim also exhibited trauma to her vaginal region that could have been consistent with sexual assault. 2RT 528-529, 537. Although Petitioner challenged this evidence on cross-examination, his conversation with the victim in the pretext call and his own admissions and confessions during a police interrogation could support a finding of guilt. *See*, *e.g.*, 3RT 619-628.

In sum, Petitioner alleges that the trial court erred in misrepresenting the prosecution's burden of proof and providing ambiguous jury instructions, but Petitioner misreads the trial court's instructions, fails to rebut the presumption that the jury followed the instructions, and fails to show the instruction had a prejudicial effect on the verdict. Accordingly, Petitioner's improper jury instruction claim is denied.

### 5. Cumulative Error (Claim 6)

In his final claim, Petitioner contends that the cumulative effect of the errors discussed in Claims 1 through 5 violated his due process rights. Dkt. No. 1 at 6, 81-83. The state appellate

court determined that it did not need to address Petitioner's cumulative error claim after rejecting the individual claims of error. *McClendon*, 2015 WL 5257759, *16 n.14. Petitioner raised his cumulative error claim in his petition for review. *See* Answer, Ex. G; Dkt. No. 13-13 at 226-27. As mentioned above, no reasoned decision exists on his cumulative error claim because the state supreme court summarily denied the petition. *See* Answer, Ex. H. Nonetheless, even under an independent review of the record, Petitioner is not entitled to federal habeas relief on this claim.

The Ninth Circuit has held that in exceptional cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id.*

However, where there is no single constitutional error existing as to Claims One through Five, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if there was "no error of constitutional magnitude occurred, no cumulative prejudice is possible"). Because Petitioner's Claims 1 through 5 fail, there is no single constitutional error that exists. *See id.* Therefore, the state supreme court reasonably rejected Petitioner's cumulative error claim. *See* Answer, Ex. H. Accordingly, Petitioner is not entitled to relief under the cumulative error doctrine.

C.      **Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.   CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  8/22/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge